# United States District Court

NORTHERN DISTRICT OF GEORGIA

ORIGINAL

UNITED STATES OF AMERICA
v.

DENORIS CARTER

**CRIMINAL COMPLAINT**

CASE NUMBER: 1:13-MJ-185   FILED IN CHAMBERS

FEB 11 2013

U.S. MAGISTRATE JUDGE
N.D. GEORGIA

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

Beginning in or about April 2012 and continuing through September 2012, in DeKalb County and elsewhere in the Northern District of Georgia, the defendant did,

conspire to obstruct and affect commerce by unlawfully obtaining United States currency from another person, with the consent of that person, said consent having been induced under color of official right; attempt to possess with intent to distribute cocaine, a Schedule II controlled substance, and possess a firearm in furtherance of a drug trafficking crime

in violation of Title 18, United States Code, Section 1951, Title 21, United States Code, Section 841, and Title 18, United States Code, 924(c).

I further state that I am a agent of the Federal Bureau of Investigation (FBI) and that this complaint is based on the following facts:

See Attached Affidavit

Continued on the attached sheet and made a part hereof.    (X) Yes ( ) No

Signature of Complainant
James P. Hosty, IV

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to before me, and subscribed in my presence

February 11, 2013                          at    Atlanta, Georgia
Date                                              City and State

Alan J. Baverman
United States Magistrate Judge
Name and Title of Judicial Officer          Signature of Judicial Officer
AUSA Brent A. Gray

## AFFIDAVIT IN SUPPORT OF ARREST WARRANT
## FOR DENORIS CARTER

I, James P. Hosty, IV, being duly sworn, depose and state the following:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed for approximately 7 years. I am currently assigned to the Atlanta, Georgia office and work on the Civil Rights/Human Trafficking/Public Corruption Squad, which has the responsibility for investigating police corruption, among other federal crimes. I am a law enforcement officer of the United States, FBI, U.S. Department of Justice, within the meaning of Title 18, United States Code, Section 3052, which includes being an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses pursuant to Title 18, United States Code, Section 3052.

2. During my law enforcement career, I have participated in dozens of investigations relating to drug trafficking and police corruption. I have received specialized training in the methods and techniques used by drug trafficking organizations. I have debriefed many witnesses and confidential informants about drug trafficking generally, as well as the specific practice of employing corrupt law enforcement officers as part of a drug trafficking scheme. Through this training and experience, I have become familiar with many of the patterns of activity exhibited by drug traffickers. Except where I state that I am relying on my training and experience as described here, the information in this affidavit is based on information and belief, the source of that information and basis for that belief being my own investigation and information obtained by other law enforcement agents.

3. I submit this affidavit in support of an arrest warrant for DENORIS CARTER for conspiring to commit extortion under color of official right in violation of Title 18, United States

Code, Section 1951, attempted possession with the intent to distribute cocaine in violation of Title 21, United States Code, Section 841, and possession of a firearm in furtherance of a drug trafficking crime in violation of Title 18, United States Code, Section 924(c).

## BACKGROUND OF INVESTIGATION

4. Based on my training and experience, I know that sophisticated drug trafficking groups distribute narcotics using a variety of covert methods that are designed to avoid detection by law enforcement and others. If detected, they are aware law enforcement will seize the drugs and money and arrest them. They also know that other drug dealers or criminal groups will rob them, if given a chance, stealing both the drugs and money. In the worst case, drug deals can turn violent.

5. Given these risks, drug traffickers occasionally attempt to enlist law enforcement officers to provide protection both for them and the drug transactions they conduct. In employing corrupt police officers at a drug deal, the traffickers hope to prevent rival groups from intervening and ultimately stealing their drugs and the drug proceeds. Additionally, they hope to keep legitimate law enforcement at bay by positioning a visible law enforcement presence at or near the drug transactions. In these cases, drug traffickers are willing to pay thousands of dollars to corrupt law enforcement officers who will provide protection for these transactions.

6. In August, 2011, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) was investigating a street gang in the Metro Atlanta area. During the course of that investigation, a confidential informant (CI-1) provided information about the gang's criminal activities. CI-1 told federal agents that police officers were involved in protecting the gang's activities, including their drug trafficking crimes. In general, these police officers, in uniform, driving police vehicles or otherwise displaying indicia of their positions, protected the drug dealers from being detected or arrested by other law enforcement officers and from being robbed by other drug dealers. The

information provided to federal agents by CI-1 regarding the use of law enforcement officers to protect drug deals is consistent with my experience and training in the investigation of similar cases.

7. CI-1, who had been working with federal agents since August, 2011, communicated to gang members and their associates that CI-1 would need police protection for his/her upcoming drug transactions. Shortly thereafter, Shannon Bass, Jerry B. Mannery, Jr., and Elizabeth Coss, none of whom are law enforcement officers, began identifying to CI-1 law enforcement officers interested in protecting his/her drug deals. Once those individuals were identified, information regarding the location and circumstances of the proposed drug deals was relayed to CI-1 and/or Shannon Bass, Jerry B. Mannery, Jr., Elizabeth Coss for him/her to pass along to law enforcement officers who expressed an interest in protecting the drug transactions.

## FACTS ESTABLISHING PROBABLE CAUSE

8. On five separate occasions beginning in or around April 2012 and continuing until in an around September, 2012, DENORIS CARTER, a police officer with Stone Mountain Police Department (SMPD), provided protection for what he believed to be drug transactions involving multiple kilograms of cocaine.

9. DENORIS CARTER has worked as a police officer with SMPD since February, 2004.

10. <u>Conversation on April 9, 2012.</u>  On April 9, 2012, a confidential informant (CI-1) had a conversation with Jerry B. Mannery, Jr. During that conversation, Mannery said that he knew of three police officers who were interested in protecting drug transactions in exchange for payment. Mannery agreed to arrange for these officers to be present at CI-1's future drug transactions. CI-1, through Mannery, arranged for DENORIS CARTER to provide protection for a drug transaction on April 13, 2012.

11.     <u>Drug Transaction on April 13, 2012.</u>  On April 13, 2012, FBI and ATF agents surveilled a drug transaction between DENORIS CARTER, Mannery, CI-1 and CI-2 in a parking lot located at the intersection of Fourth Street and Manor Drive, Stone Mountain, Georgia. When CI-1 arrived in the parking lot, the agents observed DENOIS CARTER, in his police uniform, driving a SMPD patrol vehicle parked nearby. Agents also observed Mannery parked nearby. Shortly thereafter, CI-2 arrived and parked near CI-1. CI-1 got in CI-2's vehicle with a backpack containing three kilograms of counterfeit cocaine. CI-1 handed the backpack containing the counterfeit cocaine to CI-2. In exchange, CI-2 handed CI-1 a backpack containing $4,000. During this drug transaction, agents observed DENORIS CARTER in his SMPD vehicle; he appeared to be watching the drug transaction. After this drug transaction was completed, CI-1 drove next to Mannery's vehicle. CI-1 got in Mannery's vehicle and they left the area. During a short drive, CI-1 provided Mannery with the payment of $4,000 which was to be shared with DENORIS CARTER. Mannery then returned CI-1 to the parking lot. These transactions were audio and video recorded.

12.     <u>Drug Transaction on April 20, 2012.</u>  On April 20, 2012, FBI and ATF agents surveilled a drug transaction between DENORIS CARTER, Mannery, CI-1 and CI-2 in a parking lot located at the intersection of Fourth Street and Manor Drive, Stone Mountain, Georgia. When CI-1 arrived in the parking lot, the agents observed DENOIS CARTER, in his police uniform, driving a SMPD patrol vehicle parked nearby. Agents also observed Mannery parked nearby. Shortly thereafter, CI-2 arrived and parked near CI-1. CI-1 got in CI-2's vehicle with a backpack containing three kilograms of counterfeit cocaine. CI-1 handed the backpack containing the counterfeit cocaine to CI-2. In exchange, CI-2 handed CI-1 a backpack containing $4,000. During this drug transaction, agents observed DENORIS CARTER driving his SMPD patrol vehicle slowly through the parking lot. After this drug transaction was completed, CI-1 drove next to Mannery's

vehicle. CI-1 got in Mannery's vehicle and provided Mannery with the payment of $4,000 which was to be shared with DENORIS CARTER. These transactions were audio and video recorded.

13.     Meeting on April 24, 2012. On April 24, 2012, FBI and ATF agents surveilled a meeting at a Applebee's restaurant, 4705 Memorial Drive, Decatur, Georgia, between DENORIS CARTER, Mannery and CI-1. During this meeting, the group discussed operational aspects of the April, 2012 drug transactions. CI-1 confirmed that Mannery paid DENORIS CARTER for his previous participation in the drug transactions. In addition, DENORIS CARTER agreed to follow CI-1 from the next drug transaction which DENORIS CARTER was told would involved ten kilograms of cocaine. This meeting was audio recorded.

14.     Drug Transaction on April 27, 2012.   On April 27, 2012, FBI and ATF agents surveilled a drug transaction between DENORIS CARTER, Mannery, CI-1 and CI-2 in a parking lot located at the intersection of Fourth Street and Manor Drive, Stone Mountain, Georgia. When CI-1 arrived in the parking lot, the agents observed DENORIS CARTER, in his police uniform, driving a SMPD patrol vehicle parked nearby. Agents also observed Mannery parked nearby. Shortly thereafter, CI-2 arrived and parked near CI-1. CI-1 got into CI-2's vehicle. Once inside CI-2's vehicle, CI-2 handed CI-1 two backpacks containing a total of ten kilograms of counterfeit cocaine. In exchanged, CI-1 gave CI-2 a backpack which was stuffed to appear to be contain a large quantity of cash. CI-1 then got out of CI-2's vehicle and placed the backpacks containing the ten kilograms of counterfeit cocaine into the backseat of CI-1's vehicle. CI-1 left and was closely followed by DENORIS CARTER driving his SMPD patrol vehicle. DENORIS CARTER followed CI-1 until he reached U.S. Highway 78. CI-1 then met with Mannery at Quick Trip, 1910 Lawrenceville Highway, Decatur, Georgia. During that meeting, CI-1 gave Mannery a $6,000

payment which was to be shared with DENORIS CARTER. These transactions were audio and video recorded.

15. <u>Meeting on May 2, 2012.</u> On May 2, 2012, FBI agents surveilled a meeting at a Applebee's restaurant, 4705 Memorial Drive, Decatur, Georgia, between DENORIS CARTER, Mannery and CI-1. During this meeting, the group discussed operational aspects of the April 27, 2012 drug transaction. DENORIS CARTER asked CI-1 if he/she was satisfied with the manner in which DENORIS CARTER followed CI-1 from the April 27, 2012 drug transaction. CI-1 then paid DENORIS CARTER and Mannery $500 each and told them that it was a bonus for protecting CI-1 during the previous deals. This meeting was audio and video recorded.

16. <u>Drug Transaction on May 4, 2012.</u> On May 4, 2012, FBI and ATF agents surveilled a drug transaction between DENORIS CARTER, Mannery, CI-1 and CI-2 in a parking lot located at the intersection of Fourth Street and Manor Drive, Stone Mountain, Georgia. When CI-1 arrived in the parking lot, the agents observed DENORIS CARTER, in his police uniform, driving a SMPD patrol vehicle parked nearby. Agents also observed Mannery parked nearby. Shortly thereafter, CI-2 arrived and parked near CI-1. CI-1 got into CI-2's vehicle with a backpack containing eight kilograms of counterfeit cocaine. Once inside CI-2's vehicle, CI-1 handed CI-2 the backpack containing the counterfeit cocaine. In exchange, CI-2 gave CI-1 a backpack which contained $4,000. During this drug transaction, agents observed DENORIS CARTER driving his SMPD patrol vehicle slowly through the parking lot and parking in various locations near the drug transaction. After this drug transaction was completed, CI-1 drove next to Mannery's vehicle. CI-1 got in Mannery's vehicle and provided Mannery with the payment of $4,000 which was to be shared with DENORIS CARTER. These transactions were audio and video recorded.

17.    Drug Transaction on September 20, 2012.  On September 20, 2012, FBI agents surveilled a drug transaction between DENORIS CARTER, Mannery, Bass and UC-1 at Bev's Place restaurant, 1054 Main Street, No. C, Stone Mountain, Georgia.  When Bass arrived in the restaurant parking lot, the agents observed DENORIS CARTER, wearing his police uniform and a firearm in a holster on his belt, standing near his SMPD patrol vehicle.  Agents also observed Mannery parked nearby.  Shortly thereafter, UC-1 arrived and parked near Bass.  Bass got into UC-1's vehicle with a backpack containing two kilograms of counterfeit cocaine.  Once inside UC-1's vehicle, Bass handed UC-1 the backpack containing the counterfeit cocaine.  In exchange, UC-1 gave Bass a backpack which contained $5,000.  During this drug transaction, agents observed DENORIS CARTER walking slowly through the parking lot; he appeared to be watching the drug transaction.  After this drug transaction was completed, Bass drove to a Kroger store, 965 North Hairston Road, Stone Mountain, Georgia, and met with Mannery.  There, Bass got in Mannery's vehicle and provided Mannery with the payment of $5,000 which was to be shared with DENORIS CARTER.  A short time later, agents observed Mannery meet with DENORIS CARTER at the United States Post Office, 5181 West Stone Mountain Street, Stone Mountain, Georgia.  These transactions were audio and video recorded.

18.    In communications leading up to and through the above-described drug transactions, the drug involved was described to DENORIS CARTER as cocaine.

## CONCLUSION

19.     Based on the foregoing, I submit there is probable cause to believe that DENORIS CARTER conspired to commit extortion under color of official right, in violation of Title 18, United States Code, Section 1951, attempted to possess with the intent to distribute cocaine in violation of Title 21, United States Code, Section 841; and possessed a firearm in furtherance of a drug trafficking crime in violation of Title 18, United States Code, Section 924(c).